in case number 221011 United States v. Samuels, Mr. Sepulitz. Thank you. May it please the court. Good afternoon, your honors. Kashin Samuels was not afforded his right to... I'm actually having trouble hearing you. Do you mind putting your mic closer to you? Thank you so much. Is that a little better? Okay. May it please the court. Kashin Samuels was not afforded his right to a fair and impartial trial when he was ordered to go to trial on three distinct criminal episodes before a single jury when those crimes occurred in different locations and at different times with different players. Moreover, the prejudicial joinder was compounded by the admission of prior uncharged crimes and other highly prejudicial evidence. Finally, as argued in our brief, the jury was improperly instructed on the felony murder count with regards to the appropriate mens rea. Okay. Let's start with the question of the three different trials that you say, the 2016, the 2017, and the narcotic conspiracy. Assume we agree with you that these should have, or at least some of them, should have been separated. Why was it harmful? That is, wasn't all of the evidence that would have come in and won come in anyway? And so while I might agree with you that it was wrong, in this case, what harm did it do? Yes, Your Honor. Well, certainly each crime, if looked at individually, is prejudicial, of course, because they're serious crimes, and we understand that. But when a jury hears about one crime on top of another crime on top of another crime, it's obviously much more prejudicial. You say that the harmfulness in separation is separate from the question of whether the evidence would come in? What cases do you have? That is, you are saying that somehow failure to separate is itself harmful regardless of what happened in the trial? That's your argument. Now, what support do you have for that? Well, Your Honor, as far as the evidence that would have come in? Well, certainly it would be our position that one cooperating witness, for instance, Mr. Haynes, would only be testifying about the 2016 Hobbs Act robbery, would only be testifying also regarding the drug conspiracy. So there, there is some testimony that would overlap as far as evidence. But that was completely distinct and separate from the 2017 robbery case, which involved a different cooperating witness, a different crew, so to speak, at a different location. Rick, if I may interrupt, I think what Judge Calabresi is suggesting is that wouldn't each of the conspiracies have been sufficient on their own, and therefore it be harmless, even if they should not have been properly joined? And I'm not sure that that's correct. But why wasn't each one of them sufficient? Each one? I'm not sure I understand. It's like the evidence proving the charged conspiracies would have been admissible to prove the other conspiracies, even if the charges had been separate. Well, certainly there could be some background evidence regarding the conspiracy, but the level of evidence presented and the manner in which it was presented certainly was prejudicial to the defendant. Mr. Samuels is involved in this scheme to rob other people he knows have proceeds of criminal activity, right? That was certainly the allegation at trial. And so, you know, his participation in the gang is a reason why he has knowledge that other people are involved in criminal activity or might have the proceeds, right? That was the argument made by the government. And there are members of his crew that are involved in multiple incidents, right? And so these are happening over and over again where he's doing these kinds of robberies, right? Yes, Your Honor, but those were only the uncharged robberies. So I guess – I mean that does suggest that these incidents are of a same or similar character. But even if they weren't, wouldn't it be the case that the government still could introduce background evidence of other criminal activity and of the crew and other gang affiliations and so on, even if they were separate trials? Well, it would have to go through the standard as to whether it's relevant, how it ties in, what the purpose is, and whether – even if it is relevant and has the proper purpose, if it – whether it's not substantially outweighed by the prejudice that would ensue. As far as the gang affiliation, that only was tied into the uncharged crimes, which was our position as well should not have been admitted. There was no gang affiliation alleged for the charged crimes in this case. None of it had anything to do with gang activity. Now, it is true that the district court did not do a 403 or a 404 because they said it was inexorably intertwined and things of that sort. I have trouble with this inexorably intertwined. I think that whole thing just opens up too many things. But even assuming that that was error, can't we do a 403 and 404? And on our cases, which I must say I don't much like, but on our cases, isn't pretty much all of that stuff admissible? Well, unfortunately, a lot of the case law is not favorable to the defense, and we understand that. But there is case law that we cited, too, including United States v. McCallum 584 F3D 471, which discusses the big risk here of propensity, of propensity evidence in sheep's clothing, which is essentially what we were arguing. That it's hard to extract that a jury won't – even with the proper curative instruction, you can't unring that bell. The jury is going to hear this evidence. An average layperson is going to, therefore, jump to that conclusion that this defendant has a propensity to commit these crimes. And that's why they shouldn't be allowed. Well, we allow joinder of multiple charges of crimes of the same or similar character, right? At times, Your Honor. So it can't be that just because there's introduction of other charges that it's propensity evidence and it's prohibited. So I guess my question is why aren't these of the same or similar character if, in fact, it's the same type of robbery of robbing a criminal who has proceeds from a criminal activity? And they do the same thing. They bring zip ties and masks and the same kind of equipment, and there's some overlapping personnel. Why wouldn't we say that if we can join anything, these must be of the same or similar character? Yes, Your Honor. We said it's a United States v. Tuberall in our brief. And there, there were two robberies that the court pointed out to distinctions in those particular robberies. I submit those exist here as well. We're dealing with different crews. We're dealing with different locations. We're dealing with different time periods. As far as the zip ties and the allegations regarding a weapon and any attempted Hobbs Act robbery and possession of the 924C count on the 2016 robbery, Mr. Samuels was actually found not guilty of those two counts. He was only found guilty of the conspiracy there. If I can ask the question, and I think it would be like most cases, there's going to be some similarities and then there's some differences. I think what would help me is for you to explain why the differences should be weighed more than the similarities that the government points out. I mean, the case that you're not going to find, I mean, I have not found a case that said these kinds of factors matter more than these kinds of factors. So why are your differences more probative than the similarities? Well, I think, again, citing to the Tuberall case, there were plenty of similarities there. Those two robberies occurred within a short period of time in the same location, same locale. But there were different targets. One was a bank. One was a convenience store. Here there were different targets. One individual was a fraudster. I'm sorry if I wasn't clear. I think there is a list of similarities and there's a list of differences. The question I'm asking is why are the differences more probative than the similarities? Why should they be weighed more when we're trying to assess whether or not it's enough? Yes, Your Honor, because the rule specifically states that joinder can occur when the offenses are of the same or similar character, based on the same act or transaction, or connected with or constitute parts of a common scheme or plan. We submit that these were not part of the same scheme or plan. They were not of the same character because the methods in which they were done were different. The 2016 Bishon robbery, which is known as, occurred casing out a place for quite some time regarding an individual who was supposedly storing cash there from drug dealing, which is different from using a female co-conspirator in another case to lure an individual to a motel to rob him there of supposedly proceeds or jewelry from fraud activity. Those are two very different cases involving different individuals. The co-conspirators were different from one case to the other. And the facts don't tie into each other. Are they different? So Mingo, right, participated in the Garcia robbery, but also sold drugs for Samuels, right? So there was testimony from Mingo that he sold drugs with Samuels as well. I believe his testimony was he went up to Vermont one time. And he also did not really know the other co-conspirator, Mr. Haynes. Mr. Haynes participated in the Bishon robbery and also participated in drug trafficking, right? That is correct, Your Honor. And he had discussed the Garcia robbery with Samuels. He had discussed the Garcia. I don't recall that testimony, Your Honor. My understanding is. I'll ask the government, but I think that he did, but we'll check the record. So you don't deny that there would be overlapping witnesses and evidence for all of these different charges, right? There is some overlap, Your Honor, certainly with the drug conspiracies separate from, but not between the two robberies. It's our position the two robberies do not have any overlapping facts. There is some overlapping separately with each co-operator regarding the drug conspiracy and their respective robberies. Yes, but you do not deny that even if there wasn't overlap, some of that can come in as relevant background. We would object to that, but we understand that that could very likely occur. And that would be tested under our 403-404, which, as you nodded earlier, has been very unsympathetic to the arguments you're making. Yes, and we understand the law on that, and we understand that there is an issue, rightfully so, of judicial economy. Nonetheless, it's our position the judicial economy under these facts are trumped by our client's constitutional right to an impartial trial before a single jury on a single crime and not have everything lumped together in such a way that there's no chance of him to be afforded a fair trial. Thank you. Okay, thank you very much, Mr. Cepulonci, for your time and for rebuttal. Thank you. So we'll hear from you again, but let's turn to the government. Mr. Brumwell. Good afternoon, Your Honors, and may it please the Court. My name is Christopher Brumwell. I'm an Assistant United States Attorney in the Southern District of New York. I represent the government on appeal, and I also represented the government in the proceedings below. The defendant worked with a Bronx-based crew to plan and commit robberies and sell drugs. That crew specialized in carefully planned, brutal gunpoint robberies that targeted other criminals. Samuels committed crimes with a network of other people he trusted for years. That trust and the many crimes Samuels committed resulted in the web of connections between the robberies and the drug dealing the government proved at trial. So, for example, Samuels robbed drug dealers with Robert Pizarro, and then later Pizarro conspired to rob Robert Bishon with Samuels and Philip Haynes. Philip Haynes drove Samuels' drugs from the Bronx to Vermont, and then Haynes was recruited to be the getaway driver for the Robert Bishon robbery conspiracy that involved Samuels and Robert Pizarro. Now, John Mingo also robbed drug dealers with Samuels and, again, Robert Pizarro. Then John Mingo transported Samuels' drugs from the Bronx to Vermont and planned the Garcia robbery with Samuels, and actually was there when Andrew Torres was murdered, when that robbery actually took place. So is the defense counsel right that there's overlap between the robberies and the drug trafficking operation, but not overlapping personnel between the two robberies? In terms of the robbery conspiracy, all these people are members of one big robbery crew, and that crew is behind the Bishon robbery conspiracy and the Garcia robbery. That's ultimately one of the issues that may have to be decided, and when you look at it at the start, before you've gotten a conviction on this being that kind of broad conspiracy, the things look like different robberies. They look like different crimes. Now, it turns out that you could get a conviction that says it's all the same, but in terms of deciding when it is better to try things separately, I would have thought that there's a lot more to be said for trying them separately and bringing in the evidence that is relevant, whether that is sufficient to be harmful, reversible error is another matter. But just as a matter of policy, I would have thought that if your job is not simply to get the toughest case that you possibly can, but to get a jury to tell us what crimes somebody committed, these are separate. The robbery crew in this case, in terms of how it functioned, what that crew was, the kinds of crimes it was committing in the Bronx, that was one crew of people who sold drugs together, planned robberies together, and committed robberies together. And the government's evidence at trial was aimed at proving the existence of that crew, how they worked together, how they robbed people at gunpoint, how they used masks and zip ties to carry this out. And that was what the government's proof really focused on. And so in terms of the Bishon conspiracy and the Garcia conspiracy, all those people involved are members of that crew. But if you look at who was sort of involved in those specific acts, Samuels was the one person who in common for those specific robberies. But again, it all ties together into that. That's exactly right, Judge Manasci. And one way to look at that, too, is the robberies of drug dealers, which were not charged as separate violations of the Hobbs Act. Those were part of all the charged conspiracies for the reasons Your Honors have been mentioning, the same personnel, background evidence, relationship between the participants in crime. And in this case, the drug dealer robberies involved Samuels and also one member of the Bishon conspiracy, that's Robert Pizarro, and one member of the Garcia conspiracy, that's John Mingo. So again, if you look to the broader crew, the personnel connections come together pretty squarely. Was I right about Haynes, that he had participated in the Bishon robbery and the drug trafficking and had discussed the Garcia robbery with Samuels? Is that right? That's correct, Your Honor. Haynes was a participant in the Bishon conspiracy. He sold drugs with Kashin Samuels. And after Samuels was involved in the robbery of Justin Garcia, Samuels was wearing a chain that was stolen during that robbery around his neck. And he saw Philip Haynes and essentially confessed and said, I robbed this person and all I got was this chain. And so Haynes' testimony was admitted essentially in support of all three conspiracies, both in a very direct way in the sense that he had a confession to the Garcia robbery, but also in a broader sense as background evidence to all of these conspiracies. And as Your Honors have been focusing on, because of these— Your argument is that these are crimes that are of the same or similar character and so could be joined. That's correct, Your Honor. But even if they were separated, do you agree that the evidence would have come in about the overall interaction between them and so it can't be prejudicial? Yeah, absolutely. That's correct, Your Honor. How about the fact of his being a member of a gang and that? How is that intertwined? Why is that not something that we should do a 403, 404 that the district court did not do? And isn't that pushing it rather further than many? So in this court's decision in the Williams case, the court explained that gang evidence can be admitted as long as it's relevant for a proper purpose. And in this case, the gang membership was admitted to explain how Kasheen Samuels knew that drugs and cash would be found at these apartments in the Bronx that the crew raided and robbed. So in this case, there was an apartment on 161st Street in the Bronx. How did the gang membership do that? Because that was how Kasheen Samuels knew the targets of those robberies. They were all in the same gang together. Because he was robbing other members of the gang. That's correct, Your Honor. But that's not true of the charged robberies, right? They were not members of that gang, no. So how is the gang membership relevant to the charged robberies? Or is there a position it doesn't have to be? It is for a couple of reasons, Your Honor. For one thing, the drug dealer robberies are part of the narcotics conspiracy. That was one way the narcotics conspiracy operated is they'd rob drug dealers, and then they would sell those proceeds in Vermont and in other places. So the gang membership was relevant for that charged narcotics conspiracy. But also, again, the participants in the drug dealer robberies are the people who later participate together in the Bishon robbery conspiracy and the conspiracy to rob Justin Garcia. So in that sense, again, it's direct evidence of the agreement, the background of the conspiracy. So it is relevant directly to all the charged crimes. What role does the limiting instruction play in all of this? Did you say what role does it play? Right. It directed the jury in terms of how to consider the gang evidence. No, but in terms of guarding against prejudice. I think the jury was instructed that it was only to be used for certain purposes. And I think also in terms of the prejudice analysis on gang membership, the charged conduct far exceeded the intense nature of the gang membership. The charged conducts here involved murder, kidnapping, gunpoint robbery. I mean, tying people up and blindfolding them. And the gang membership was really referenced in passing and not in connection with the gang committing crimes of this nature. So any prejudice was really far exceeded by the probative value of this evidence. Do you want very quickly to address the Rakoff arguments in Rosamond? Yes, absolutely, Your Honor. I mean, they made it, and so we have to deal with it. The felony murder is the established law in this circuit that was recognized in this court in the Thomas decision. And the law on that is clear. The malice of a robbery satisfies the malice requirement for murder. And nothing in Rosamond changed that analysis. Rosamond was not a case about the felony murder rule, and nothing about it would change it. So that whatever one might think, and maybe the Supreme Court might go somewhere, at the moment we are still bound by our previous precedence. That's exactly right, Your Honor. Well, Rosamond would tell us that to be an aider and abetter of the robbery, you have to have a mens rea that extends to the robbery. But then if you do, and you're an aider and abetter, then you're charged as principal of the robbery, right? If you're an aider and abetter of the robbery, then— You have a culpability of a principal. That's exactly right. And if a principal is liable for felony murder, if there's a murder during the robbery, then somebody who is charged as principal would also similarly be liable, right? That's correct, Your Honor. So it seems like it would be weird if there was a stricter mens rea requirement for an aider and abetter than for a principal of the robbery. Absolutely right, Your Honor. Can I ask about the constructive amendment argument quickly? So what's the purpose of the to wit clause in the indictment if it doesn't really limit the evidence that the government can present? I think in this case, the to wit clause illustrated just one way of committing the crime here. And it just puts out in front of the defendant one way that that happened. But it does not, under the court's decisions in D'Amelio and Agrawal, limit the government's evidence. So the to wit clause is like for example, or as an illustrative example of how the crime would be committed? In this case, again, where there's a broad charge and the defendant is put on notice about this is the set of criminal acts that you're going to be held responsible for at trial and what the government's going to prove, it does merely illustrate one way that that happened. And that's similar to the D'Amelio case where the to wit clause charged the Internet and a computer as a way of committing the crime, but a telephone was allowed as well. And so here the to wit clause illustrates one way of aiding and abetting the robbery, but it doesn't limit. The indictment doesn't say that. The indictment doesn't say to wit by doing this as one example and possibly there's other ways of support, right? The to wit clause mentioned one way of aiding and abetting the robbery. But it doesn't say that it's only one illustrative example. It says that this is how he did the thing, right? This is to wit, and I could look at the indictment, but it certainly does not say for example. And under the case law that we cited in the brief construing to wit clauses, they don't limit the core of criminality. So when the core of criminality is charged in other parts of the indictment and in that charging language, the government can prove that core of criminality. And here the indictment charged Kachine Samuels with being part of a plot to rob Robert Garcia for longer than just that one day and part of a plot to rob him in the Bronx and in New Jersey. And so read as a whole, the indictment absolutely gave notice that the government's proof was going to not be confined to merely the one episode in the to wit clause and encompassed many forms of aiding and abetting the robbery of Justin Garcia, which led to tragically the murder of Andrew Torres. Okay. Thank you very much, Mr. Bromwell. Let's turn back to Mr. Sepulveda. Thank you, Your Honors. Thank you, Your Honor. As far as the felony murder jury instruction, it's our position that the Roseman v. United States Supreme Court case does change the landscape here, and it was applied appropriately in the Giamfi case, which has a set of facts that's eerily similar to the ones we have here for Mr. Samuels. All the cases cited by the government, except for the Rivera case, which we feel is not on point and not binding on this court, all the other cases from the Second Circuit cited by the government predate the Roseman v. United States decision. But isn't Roseman distinguishable? I mean, it primarily concerns the intent required for aiding and abetting a drug transaction during which a firearm is discharged, right? That's different from what we're dealing with here. Yes, absolutely. Roseman is a different set of facts, but as applied to Giamfi, and as it should have been applied here, it does require an additional instruction to the jury regarding an appropriate mens rea. Mr. Samuels is not being charged as an aider and abetter of a murder. He's being charged as an aider and abetter of a robbery, right? So Roseman says he has to have a mens rea that extends to the robbery, but once it's shown that he does, then he's liable as if he were a principal of the robbery, right? Well, Roseman also discusses it in the context of a 924C. Here we're dealing on a 924J, both involving the idea of the weapons and how the weapons are going to be used in that robbery. So it does have some applicability here as well if you extend that 924C argument to the 924J, as was done in Giamfi. So certainly we believe there should have been some kind of foreseeable aspect, and that was part of the charge here that Mr. Samuels was somehow responsible for the guns. So is your position this, that if he were a full participant in the robbery, not charged as an aider and abetter, just was there in the thick of things, you would not need to show a mens rea that extends to the murder, but because he's an aider and abetter, you do. So there's a stricter mens rea requirement for an aider and abetter than for a principal. Yes, Your Honor, pursuant to the holding in Roseman. But how does that make sense? Why would an aider and abetter have stricter mens rea requirements to the murder than somebody who was right there in the thick of it? Well, if they're right there in the thick of it with the gun present, then it's reasonably foreseeable under the circumstances, and that's one of the elements the Giamfi court specifically referred to that element that the defendant would know there was a genuine risk that someone would be killed during the robbery. If you're present there with a gun being brandished, obviously that element is satisfied. If you're not present, as Mr. Samuels was not present. Well, it could be that one could make that distinction, but the question is, has the Supreme Court made it? Because if the Supreme Court has not yet made it, though you might argue that they should and you might argue that they shouldn't, we're still bound by things before. We don't go where the Supreme Court is going to go, thank God. Certainly the Supreme Court was dealing with a different set of facts in Roseman, and we understand that. But we believe it was further compounded by the constructive amendment of the indictment, and our case is distinguishable from D'Amelio, Agrawal, Bankey, and Bastian. All of those cases involved what was referred to as a minor difference in detail regarding to the amendment of the wording in the indictment, where it was one type of gun instead of a different type of gun, or it was use of phone instead of the Internet. Here we're dealing with aiding and abetting in any which way the jury can dream of, whether it was Mr. Samuels driving, providing guns, getting coffee for the co-conspirators. It doesn't say, there's no way to specify. There's nothing about the guns, there's nothing about the weapons, which was one of the key issues of dispute in this trial as to whether he was the individual that supplied those weapons and enabled them to engage in that conduct. Thank you. Okay, thank you very much. Thank you, Your Honor. The case is submitted.